I have four cases for argument before the Court this morning. The first case before the Court is Senju Pharmaceutical Co., Ltd. v. Akorn, Inc. Case number 171511, it is an appeal from a decision of the Patent Trial and Appeal Board. Mr. Metlitsky. Metlitsky? Metlitsky. Metlitsky. Okay. You want five minutes for rebuttal? Yes, please. All right. You may begin. Thank you, Your Honor, and may it please the Court. The invention here is a novel diplopredanate emulsion, which improved upon the diplopredanate suspension disclosed in the Kimura 848 patent by dramatically increasing the drug's bioavailability within the eye, and was the first and remains the only seroidal emulsion eyedrop ever approved by the FDA and sold. The Board found that the patent here was obvious because a person of ordinary skill in the art would have identified problems with steroidal suspensions, for example, low bioavailability, and supposedly would have been motivated by Deng to solve the problems. Is it your argument that the creation of the emulsion, the use of the emulsion, was beyond the skill of a person of ordinary skill in the art? This is back in, at the time of the invention, 1997. No, our argument isn't that the creation of the emulsion itself was beyond the skill of a person of ordinary skill in the art, but our argument, for example, is that there would have been no motivation to do so. But there were other ocular emulsions on the market at the time, right? There were not any other ocular emulsions on the market at the time, and there still are no ocular steroidal emulsions on the market at the time, except for Durazol, which embodies the claimed invention, and in fact, that's... But there were emulsions that were not steroidal, right? I don't think there... I'm not sure there were emulsions that were not steroidal on the market at the time, but for example, there is Auergan, who was Deng's assignee, in 2002 put out a drug called Restasis, which is Deng's cyclosporine emulsion, right? Auergan markets a different eyedrop, a steroidal eyedrop, as a suspension. Now, so the first argument I wanted to discuss with the court today is the fact... But the issue here isn't necessarily the medication, isn't it more the vehicle that's used to deliver the medication? That's what we're talking about right now, and there were emulsions that were used to deliver medication to an eye at the time. There was prior art that described emulsions, for example, Deng, yes, yes, sure, but there are questions about whether a person of ordinary skill in the art would have been motivated to combine the Kimura suspension with Deng, which is the question in this case, when Deng actually taught that as to the target tissue of diphenyprednate, the castor oil emulsion that Deng described was inferior to other formulations, including a solution. Deng didn't actually discuss suspensions or steroids, but he tested the emulsion against several other formulations, including a solution that the reference elsewhere describes is what Deng was trying to improve upon, and found that the emulsion was inferior, and our expert... We're not really making a teaching away argument, though, are we? We're not making a teaching away argument, we're taking Deng for all it teaches, but what Deng teaches is that the emulsion is inferior to most other formulations tested as to the target tissue of the active here, and our expert explained... Was it inferior as to the target tissue, or inferior when used in combination with the cyclosporine? Well, all of the formulations were used in combination with the cyclosporine. They were all tested as the four different tissues. Right, so one was inferior to the other... Yes. In that combination, right? Right. So there was, for example, a castor oil with cyclosporine, a castor oil emulsion, which is the emulsion here with cyclosporine, a solution, an aqueous solution with cyclosporine and so forth, as to four different tissues. The board agreed with us that the lacrimal gland experiment had no relevance to motivation to combine, but found that the experiment as to the conjunctiva was relevant, because the conjunctiva was a diphoprednate target tissue, and in that experiment, you can look at page 11 of the board's opinion. It's the top left bar chart, and it shows that the emulsion is the fourth out of five best formulation, and it's substantially worse than the solution that Ding is actually trying to improve upon. The castor oil emulsion is second from the left, and the solution is third from the left. What inference do you think is mandated from that, if you take into account the findings about reduced irritability and eliminating the need to vigorously shake? I don't think that there's any inference that's necessary, but the legal error that we're discussing here, as to the motivation to combine analysis, is the board's simple assertion that there would have been a motivation without any explanation or reliance on expert testimony for why there would have been. Our expert explained that a person of ordinary skill in the art... I'm sorry, doesn't Ding expressly talk about the reduced irritability benefits, at least, and maybe the stability benefits? Compared to other prior emulsions, Ding doesn't discuss suspensions at all. Well, what do we do about the fact that the board expressly found that Ding broadly states that emulsions are appropriate for delivery to these tissues? Well, that's a separate error. The board, in particular, the board said that in response to our unexpected results argument. We explained that the diphloprednate emulsion exhibited four times bioavailability, twice the bioavailability at half the volume to Kimura's diphloprednate suspension, and our expert explained that that would have been unexpected. The board said, no, it wouldn't have been because a person of ordinary skill in the art, at the time, would have generally expected emulsions to exhibit enhanced bioavailability to suspensions, no matter the active. And the reference that they relied on was the Saviv reference, which ran an experiment on indomethacin, which is a nonsteroidal anti-inflammatory drug found in enhanced bioavailability of emulsions to suspensions. Our expert explained, look, a person of ordinary skill in the art wouldn't expect an indomethacin experiment to apply to any other drug, particularly a steroid, because, for example, the structure of the actives are very different and that can affect bioavailability. And the board rejected that argument based on two references, Casim and Ellis, which don't mention suspensions. They only look at emulsions versus solutions. And so that by itself is arbitrary and capricious for two reasons. First of all, it's a non sequitur. The board itself recognized that the question is whether emulsions generally exhibit enhanced bioavailability over suspensions. So emulsion over solution references is just a logical error. And the second problem, if you're going to for some reason look at emulsions versus solutions, surely you can't ignore DING, which teaches that as to the target tissue of diphupredonate, emulsions are, at least this castor oil emulsion in particular, is inferior to a cyclodextrin solution. So you can't ignore the primary reference in the case when you're trying to prove an already illogical point that the fact that emulsions are better than solutions somehow demonstrates that emulsions as a general matter are better than suspensions. So that's as to the board's unexpected results analysis. That's just an independent, arbitrary and capricious error that supports affirmance. But before I run out of time, I wanted to get... Can I just ask you, and this maybe is a legal question, don't unexpected results, when viewed as a secondary factor, consideration, have to be unexpected with respect to what the reasonable expectation of success is? Not unexpected compared to what was in the prior... Yeah, I wouldn't disagree with that. What evidence is there that the benefit here, the results here, were unexpected compared to what somebody would reasonably expect, like a doubling of effect from Abib? So our expert testified, opined, that the result was unexpected and the board accepted that expert testimony could be sufficient, but the board found that other evidence contradicted the fact that this would have been an expected result and the evidence is what I just described. It's the Abib reference with an NSAID that our expert explained wouldn't have told you anything about a steroidal emulsion versus suspension result. And then these other references about emulsions versus solutions that are, first of all, arbitrary and second of all, don't even mention DING. So the other error that I wanted to discuss is the fact that the board completely ignored real-world objective evidence of non-obviousness that we put before it and that it never even acknowledged, let alone considered. First, we demonstrated that there are today, I believe, six steroidal eye drops on the market. Three of them are suspensions. One is a gel, one is an ointment, and one is Durazol. You're arguing hindsight right there, aren't you? No, to the precise contrary, Your Honor. We have to look at whether person, owner, skill, and art would have combined at the time of the invention. You absolutely do, and the Supreme Court and this Court have explained over and over again that the way to guard against hindsight bias in that analysis is to consider objective, real-world evidence in the market of non-obviousness. And this is objective, real-world evidence in the market of non-obviousness. As I said before, first of all, nobody has migrated steroids to emulsions if their theory of obviousness is that steroids exhibit particular problems and it would have been obvious that the way to fix those problems is just to migrate the active from a suspension to an emulsion. Nobody has done that, and in particular, When your claims are not limited just to eye drops, right? That's true. They're not limited to eye drops, but this is evidence that provides a real-world test of their hypothesis of non-obviousness, right? The other piece of evidence is that Allergan itself, But the motivation to combine doesn't necessarily have to be exactly what your motivation might have been, so they might have had the motivation to combine this for purposes of using it as a nasal drop or for the ears. The board didn't say anything like that. The board thought that the motivation to combine was based on the conjunctiva experiment in Ding. But right now, I'm not even talking motivation to combine, we're talking about a hypothetical motivation based on the prior art of the time. I'm talking about basically like a secondary consideration, real-world objective evidence that tests their hypothesis, their own theory of obviousness here. So, for example, if it were true that suspensions exhibit particular problems and that it would have been obvious to look at Ding and say, OK, I know how to solve those problems, I'm just going to make a castor oil emulsion. Why hasn't anybody done it in particular? Why hasn't Allergan, Ding's assignee, that actually markets Ding's own castor oil emulsion with cyclosporine, still market a steroidal suspension? If we were before the board, I would say that this is conclusive evidence of non-obviousness. I'm not saying before this court that it's conclusive evidence of non-obviousness. I'm saying the board can't just ignore it. That's an error of patent law. This court has repeatedly held that every fact-finder has to consider evidence probative of obviousness. Are there multiple reasons why someone might choose not to market a particular product? There may well be, Your Honor. That's a question for the board. Again, the board has to consider this evidence and make a finding on it, both as a matter of patent law and just as a matter of administrative law. This court can't review the board's decision when it hasn't actually responded to probative evidence. There's another piece of evidence that the board ignored, which is their own expert's patent application, which invented a combination of cyclosporine, which was Ding's active, and a steroid in an eyedrop. He recited Ding, discussed Ding, talked about Ding as having formulated cyclosporine in an emulsion. But then when he described his own formulations, he doesn't mention an emulsion at all. Again, that's real-world evidence of what an actual artisan would do when looking at eyedrops and looking at Ding. It was obviously not obvious to him that the way to... one way to formulate the drug would have been as an emulsion. All right, you're in for your rebuttal time. I'll give you three minutes for a rebuttal. Thank you, Your Honor. Can we start with this objective in vitro evidence? Because it is kind of surprising that the board doesn't even mention any of this real-world evidence. And yet our case law is very clear that that's very relevant to the question of whether we're overdoing the use of hindsight. That's right, Your Honor. Chandra Kavira, Your Honor for Appellee Acorn. Your Honor, the board actually does cite to this evidence on page 8 of their decision. The board considered this hindsight argument that Sanju was making and found it just not persuasive because the patent was not to a method of choosing dactylprednate or a method of choosing emulsions. So it actually did consider the argument. It acknowledged the patent owner's position on this issue and simply decided that it was not persuasive. Because what Sanju is not disputing here is that every claim... No, they don't cite to any of this real-world evidence. That statement by the board is totally addressed to a different argument. Your Honor, so the citation at the end of the paragraph on JA8, idea 10-16, there the board is citing to the pages of the patent owner's response where Sanju made this hindsight argument and made this argument considering regarding the availability of current commercial formulations and Dr. Shah's application. So they did consider it. It came up in the oral argument as well. So the board had an opportunity to consider it but simply found that the evidence was not persuasive. And the conclusion is on the top of the next page, JA9, the first sentence. And the reason the board found this to be true is it is uncontested here that every claim limitation of the 3-9 patent was already present in the prior art. So you already had DING, you already had the 848 patent disclosing and teaching the use of diphtheropredanate and you had DING that taught the use of an emulsion as a suitable vehicle to formulate poorly water-soluble drugs. And that was the issue in the prior art is the formulation of poorly water-soluble drugs such as diphtheropredanate. I'm still having a problem with these statements by the board that you think are so meaningful because unlike a district court decision where we can assume the district court considered all the evidence, under the APA there is an obligation to engage in reasoned decision making and how is a statement that we considered 7 pages of argument and we reject it, reasoned decision making? Your Honor, the thing that I want to point out is the weight of this evidence. It is unclear what argument Sanju is really making or what the weight of this evidence should be that current commercial formulations should play a role in determining the obviousness of a patent whose priority date is in 1997. The weight of that evidence is tiny to say the least. In terms of this argument that they make regarding Dr. Shah's work at Bausch & Lomb and his patent application, as Dr. Shah testified on the record his work at Bausch & Lomb and any formulation that he worked on at Bausch & Lomb was not his decision, it was a business decision. Dr. Shah was bound by confidentiality agreements to Bausch & Lomb and couldn't explain exactly why Bausch & Lomb had not picked an emulsion but what he did say... When you say it's not really relevant, why isn't it relevant that no one else has picked an emulsion after all these years and yet you turn around and say but it would have been really obvious to do that. As Dr. Shah testified, there are several reasons why somebody would not have picked an emulsion. One of them, he said, was the use of a blocking patent and if one looks at the fact that DING was issued in 1995, claimed as an example cyclosporine in an emulsion and if you consider the fact that Bausch & Lomb was working on a formulation that combined cyclosporine with a soft steroid, there are reasons why, just as Dr. Shah said, somebody might not have made an emulsion. Senju has not pointed to any statement this entire time where anybody has said we did not use emulsions because emulsions were bad or that we did not think emulsion was an appropriate vehicle. What about his point that even DING puts emulsions at the end of the category of useful options? Your Honor, that statement is completely unsupported by the record. The invention of DING is an emulsion suitable for delivery to ocular tissues. That is all that DING is disclosing and it's an emulsion. It runs these comparisons between emulsions and the cyclodextrin solution but its entire invention is this emulsion used to formulate poorly water-soluble drugs. The claims of DING are to an emulsion suitable for delivery to ocular tissues. At at least five points in DING DING expressly says that it is suitable for delivery of medications to ocular tissues and I can point those out. It's at Joint Appendix 675, Joint Appendix 681 to 682 and Joint Appendix 694. At 694, this is page 18 of DING DING concludes the emulsions were also effective in delivery of the active ingredient to the tissues of interest, lacrimal gland, cornea and conjunctiva. And the 848 is not directed to the lacrimal gland, right? Your Honor, the 848 is directed to exactly what DING is directed to, which is eye tissues in general. The 848 discloses a diphleopredanate suspension and discloses expressly that diphleopredanate was used to treat inflammation and allergy disorders of the eye. And this can be found in the abstract as well as in... Well, there are different parts of the eye. I mean, if you go through this record, there's a lot of discussion about the different eye tissues that need to be treated and which ones get more irritated by certain formulations. I mean, I don't think you can just say it goes in the eye so therefore it's the end of the inquiry. Your Honor, so this re-reading of this interpretation of the 848 patent is Sanju's and Sanju's alone. Because if you look at what the 848 patent is expressly teaching you, it is essentially teaching the fact that diphleopredanate is an ophthalmic suspension that shows superior anti-inflammatory and anti-allergic reaction by local administration for disorders of the eye. And as exemplary for diseases, it lists a bunch of diseases. So there is nothing in the 848 patent... Was the lacrimal gland ever mentioned in the 848 patent? The lacrimal gland is not, Your Honor. But the lacrimal gland suffers from inflammation, same as it is a disorder of the eye, and so would be covered as a use for diphleopredanate in the suspension. The 848 is simply a discloses a suspension. And so the target tissue is, again, said more to what diphleopredanate does, and diphleopredanate is an anti-inflammatory and anti-allergic which treats any disorder of the eye. This entire conversation that Sanju, this argument that Sanju has made regarding this target tissue is simply not, is a red herring because both the 848 patent as well as DING both teach formulations that are suitable for delivery to the eye. The 319 patent the patent at issue is a purely composition patent. It has four, it claims a composition with diphleopredanate, water, castor oil and polysorbate 80. So it does not target, it does not have a target tissue or a minimum therapeutic value. So these arguments that Sanju has made regarding this target tissue, these are all of its own making. The express disclosures of DING the express disclosures of the 848 patent and the arguments made by Dr. Shah make very clear that both of these pieces of prior art covered formulations that was suitable for delivery to the eye. So just to be clear, your claim is that the 319 patent are formulation claims and that there's nothing in the formulation claims that are directed to or claim a specific target in the eye. That's right, your honor. The most claims for 319 patent are, they claim this emulsion in the form of an eye drop a nose drop and a ear drop. And so a skilled artisan may assume, take that to mean that it could be for delivery to the eye generally, the nose or the ear. But again, there's no target tissue requirement and there is simply no minimum therapeutic value that it has to reach. So these arguments are simply just Senju's attempt to steer the conversation away from what the board found, which was that there would have been a reasonable motivation to combine and a reasonable expectation of success to combine what was clearly disclosed in the 848 patent and DING. The other point that I would like to make is that in terms of this real-world evidence that Senju keeps pointing to all of this real-world evidence they argue should be should have considered in its motivation to combine analysis, yet it's all post-filing evidence. The patent that Senju spent so much time talking about, Dr. Shah's patent Objective indicia is often post-filing evidence. That's the whole point, is that you've got real-world evidence of what's going on and your whole point is to say, are we overdoing our assumptions with respect to motivation to combine? Are we putting too much hindsight bias into that? And so you look at the broad scope I mean obviously, and I shouldn't use the word obviously, but when you're talking about for instance the success on the market I mean, that's post-filing evidence so you can't say post-filing evidence is not relevant to motivation to combine. That's exactly what it's relevant to. That's right, Your Honor, but this is not, so Senju is sort of hedging on words. It calls it real-world evidence but it hasn't actually articulated an objective indicia that it is applying this real-world evidence to. This real-world evidence that it is talking about, it actually is in its reason to, motivation to combine and reasonable expectation of success. So it is actually wants you to apply I think I was looking at the right document this is the stuff cited 10-16 the heading that that's under is person of ordinary skill in the art. It's not even motivation to combine let alone any of the secondary considerations. I guess I would have maybe, I'm beginning to understand why the board discussed this only in this section of the opinion because it's not clear what legal element this is at A222, am I looking at the right place? Yes, Your Honor, this is, this starts at this section starts with the at JA223 petitioner uses hindsight to select DING and diphenylpredonate and in the subsequent pages Senju goes through all of these real-world evidence and misleadingly uses the word objective indicia or rebuttal evidence but really what it's arguing is that this is the evidence somebody should consider when looking at motivation to combine and reasonable expectation of success which are all in the prima facie case and so all of this evidence that Senju is actually relying on what is currently on the market has no relevance really to whether or not this patent would have been obvious I think you're misunderstanding the whole role of objective indicia they're not placed in one place or another you're supposed to look at the totality of the evidence and the whole point is you should say to yourself, am I assuming too much motivation and does this later evidence or this other evidence enlighten me as to whether or not I'm putting too much hindsight into the analysis so you can't cut it up and say some evidence only relates to one thing, some evidence only relates to another they're all relevant I was only pointing to the argument that Senju made but if you were to even consider this evidence again, it has no bearing on whether or not this patent was obvious because as Dr. Shaw testified testimony on the record, there are business decisions that go into what is currently on the market there are blocking patents to consider Dr. Shaw testified that sometimes innovative companies may not use emulsions because emulsions are easier to reverse Where does the board cite Dr. Shaw's testimony on that point? Your Honor, this is on APX 2879 I think the question was where did the board cite that? Oh, I'm sorry. The board actually did not cite Dr. Shaw's testimony on this issue but it considered, again like I said, it considered all of this when it said that all of these hindsight arguments that Senju was making, it did not find persuasive because emulsions, the other thing that the board found in his decision is that emulsions had been known for several years to provide better bioavailability for poorly water-soluble drugs Yes, my friend brought up Aviv, which showed better bioavailability using indomethacin. Indomethacin was not a steroid but it was a poorly water-soluble drug and that's the issue The art had trouble formulating poorly water-soluble drugs like daxeprednate indomethacin in suspensions because they don't dissolve in water. In a suspension they remain suspended in water. You have to really shake them very hard for them to disperse in water and they don't disperse all the way, which causes irritation to the eye. The benefit of emulsions... You're out of time and you're going off into a totally different argument We'll hear from the other side Thank you, Your Honor Thank you, Your Honor. Judge Taranto, real quick on the appendix. There are pages missing in the appendix. Page 9 is missing and the title to the section is actually called Formulation Challenges and it goes first before the priority date and then starts talking about later real-world evidence What was the point being made to the Board under this heading Formulation Challenges? The point being made to the Board as to this particular evidence is just that this is real-world evidence that tests their theory their particular theory in this case of obviousness which is that there were known problems with suspensions and the obvious way to fix those problems would be to migrate to an emulsion, even with steroids and the real-world evidence just demonstrates that that hasn't happened and the Board needs to consider that evidence Now, my colleague said that there's a question about weight At the time of invention, were emulsions being used to deliver medication to the eye? I'm not sure that there was actually a marketed product I don't think there was a marketed product Did the records show instances where emulsions were used? Oh yeah, sure. Ding shows an instance where an emulsion is used to deliver cyclosporine to the eye. Not a steroid It doesn't compare to a suspension The issue is in when emulsions began to be used You want us to take a look at emulsions only from real-world evidence as of today Not only, Your Honor Just as this Court always teaches that you look at the prior art but you also have to look at real-world evidence If it's also, what's your point? I don't understand your argument Because it's probative of their theory of non-obviousness Their theory is that a person of ordinary skill in the art would have been motivated to combine chemo or a suspension with a castor oil emulsion because everybody just knew that the way to solve problems with suspensions is to migrate them to emulsions under Ding And yet nobody has actually done that The fact that it hasn't happened a year later, or two years later, or three years later doesn't make it non-probative of that question It guards against hindsight One way to solve the problems is to do this It doesn't have to be the only way And then if there are a bunch of ways all kinds of factors go into deciding who's going to do what I don't think that's the theory that the Board adopted I think the Board adopted the theory that it was clear that suspensions had particular problems that emulsions obviously solved But in any event, it's still probative of the question of non-obviousness And the Board has to consider it Did you present any testimony to rebut Dr. Shah's testimony? Well, Dr. Shah's testimony was So Dr. Shah testified I think to two relevant things in his deposition One was that there were business reasons Well, I mean, Ding would have been a blocking patent, right? Arguably Well, I don't think so. I mean, it was limited to cyclosporine And there's plenty of suspension patents out there too And yet people market suspensions In any event, again, that's a question for the Board to decide If it thought that the reason that this evidence wouldn't overcome a finding of obviousness is because Ding was a blocking patent It has to say so I'm running out of time But on motivation to combine The question of target tissue It's true that when you're comparing the claimed invention to the prior art You look at the claims But a motivation to combine There has to be some actual motivation to combine the suspension with Ding's emulsion If Ding's emulsion was taught enhanced bioavailability To some completely like the toenail or something like that Nobody would think that there would have been a motivation to combine Even though there is no method of treatment claim In the claimed patent And the Board agreed with that That's why the Board looked at the conjunctiva experiment And as our expert explained The conjunctiva experiment showed that the emulsion formulation Was actually inferior to other formulations Including the one that Ding was trying to improve upon You're out of time Thank you Your Honor